UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

YULIYA GLAZMAN,

    *Plaintiff,*

    v.                       Case No. 8:26-cv-02265-TPB-SPF

CITIGROUP, INC., and
CITIBANK, N.A.,

    *Defendants.*

## PLAINTIFF'S MOTION TO VACATE SUA SPONTE TRANSFER ORDER, RESTORE THE ORIGINAL RANDOM JUDICIAL ASSIGNMENT, AND, IN THE ALTERNATIVE, FOR DISQUALIFICATION UNDER 28 U.S.C. § 455(a)

### I. RELIEF REQUESTED

1.    Plaintiff moves, before any Defendant has appeared and before this Court has entered any substantive order, to vacate the sua sponte transfer order entered August 6, 2026 (Doc. 4), withdraw the consent memorialized in that Order, and restore this action to the assignment made through the Clerk's random-assignment process: the Honorable William F. Jung. If Judge Jung does not consent to receive the action, Plaintiff requests random reassignment through the Clerk. In the alternative, Plaintiff moves for disqualification under 28 U.S.C. § 455(a) and reassignment through the Clerk.

2.    The transfer was authorized. Local Rule 1.07(a)(2)(A) permits a judge to transfer an action when the receiving judge consents. But authority to act is not

the question. The question is whether the transfer should stand once the complete, undisputed sequence is placed on this docket. That sequence must answer to Federal Rule of Civil Procedure 54(b), to 28 U.S.C. § 455(a), and to the integrity of random assignment itself.

3.    The sequence is short. On August 5, 2026, Judge Barber entered an order in *Glazman v. Citigroup, Inc.*, No. 8:26-cv-01522-TPB-AEP (M.D. Fla.) (the "First Action"), compelling arbitration of all ten claims, staying the action, and directing administrative closure. First Action, Doc. 54. The Order rejected the legal characterization of the sexual-harassment dispute on which this Second Action depends. It also stated on the public docket that Plaintiff's bonuses reflected "poor performance ratings." First Action, Doc. 54 at 2. The operative pleading alleges four consecutive ratings of two—the second-highest rating on Defendants' one-to-five scale. First Action, Doc. 22 ¶¶ 26–27.

4.    Plaintiff filed this action the same day. The Clerk randomly assigned it to Judge Jung. One day later, before any Defendant appeared, before any party requested transfer, and before Plaintiff could be heard, Judge Jung transferred the action to Judge Barber "with his knowledge and consent." Doc. 4. The transfer was not automatic, and it was not clerical. It was an affirmative judicial decision by the transferor and the receiving judge alike.

5.    The Second Action alleges retaliation and discrimination occurring on or after March 16, 2026, because Plaintiff filed and prosecuted the First Action and pursued related administrative charges. Doc. 1 ¶¶ 1, 16–19, 51–73. It invokes the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act

("EFAA") because the new claims relate to the sexual-harassment dispute asserted in the First Action. Id. ¶ 5. One day after rejecting the legal character of that dispute, Judge Barber consented to receive the new action in which the same dispute anchors both the retaliation theory and the statutory election against arbitration.

6.     Plaintiff is contemporaneously asking Judge Barber, in the First Action, to correct the public description of her professional performance, correct three clerical errors, reconsider the arbitration ruling, and certify the controlling EFAA question under 28 U.S.C. § 1292(b). Unless the transfer is vacated, one judge will decide whether his own order is accurate, whether it is correct, whether it may be appealed, and whether its reasoning will send this case to arbitration as well.

7.     An objective observer could reasonably see that arrangement as institutional self-reinforcement rather than independent adjudication. Plaintiff asks the Court to resolve the assignment question first, on a complete record and by reasoned order, before it considers any motion to compel arbitration, motion to dismiss, or other substantive request.

## II.    THE MATERIAL DOCKET RECORD

### A.    The August 5 Order in the First Action

8.     The First Action was filed on March 16, 2026. The operative First Amended Complaint asserts ten employment claims, including a Title VII hostile work environment based on sex, unequal pay, unequal terms and conditions, discriminatory termination, and retaliation. First Action, Doc. 22. Defendants

moved to compel arbitration and to dismiss or stay the action. First Action, Doc. 29.

9.   On August 5, 2026, Judge Barber granted the motion in part, held the arbitration agreement enforceable, stayed the case, and directed administrative closure. First Action, Doc. 54 at 8–9. The Order adopted the rule that the EFAA exclusion applies only when a plaintiff states a plausible sexual-harassment claim capable of surviving Rule 12(b)(6). Id. at 5. It then framed Count I as an attempted "sexual harassment claim," contrasted the allegations with quid pro quo demands and sexually explicit conduct, and concluded that the allegations showed "at most discriminatory unequal pay and assignments." Id. at 6–7.

10.   The Order also acknowledged a competing EFAA standard under which a plaintiff need plead only nonfrivolous claims relating to conduct alleged to constitute sexual harassment, leaving sufficiency for ordinary merits adjudication. Id. at 7 n.3. The Order held that Plaintiff would fail under that standard as well "for the same reasons discussed herein." Id. The First Action therefore presents an unsettled legal question whose resolution may control whether Plaintiff's employment claims remain in federal court.

11.   The Order's Background section further states that, although Plaintiff received annual bonuses, "the amounts of those bonuses reflected poor performance ratings given to her by Defendants." Id. at 2. The operative pleading alleges that Defendants used a one-to-five performance scale, one was the highest achievable rating, and Plaintiff received a rating of two for four consecutive years. First Action, Doc. 22 ¶¶ 26–27. The pleading alleges no poor rating. The

challenged sentence therefore reports the opposite of the pleaded professional record.

12. The Second Action alleges that Defendants recruited Plaintiff for an internal position, interviewed her, selected a male candidate, failed to advance or select her for eleven later positions, and caused loss of professional standing. Doc. 1 ¶¶ 26–31, 37–47, 57, 64. The First Action Order attributing poor performance ratings to Plaintiff remains on the public docket.

**B.      The Second Action and Its Original Random Assignment**

13. Plaintiff filed this action on August 5, 2026. Doc. 1. The Complaint separates the new case from the First Action by date and remedy. Every claim concerns adverse conduct occurring on or after March 16, 2026, and the Complaint expressly disclaims duplicative recovery for earlier conduct. Id. ¶¶ 1, 16. The pleaded events include the April 7 separation agreement, Defendants' unsolicited internal recruitment and April 23 interview, selection of a male candidate, the May 11 revised separation agreement, twelve applications for eleven positions, and Defendants' response or non-response to those applications. Id. ¶¶ 22–47.

14. Count I alleges Title VII retaliation for asserting and prosecuting the sexual-harassment dispute. Id. ¶¶ 51–57. Count II alleges sex discrimination in the internal hiring decision. Id. ¶¶ 58–64. Count III alleges retaliation under the Fair Labor Standards Act. Id. ¶¶ 65–69. Count IV alleges retaliation under the Florida Private Sector Whistleblower Act. Id. ¶¶ 70–73. The claims require adjudication of later conduct, later employment decisions, separate instruments, separate applications, and separate administrative predicates.

15.    Paragraph 5 makes a new EFAA election. It alleges that each new claim arose from Defendants' conduct following and because of Plaintiff's assertion of the sexual-harassment dispute in the First Action. Doc. 1 ¶ 5. The Second Action therefore presents an EFAA relationship question arising from alleged post-filing retaliation, not merely a duplicate of the First Action's claims.

16.    Under Local Rule 1.05(a), the Clerk randomly assigned the new action to Judge Jung and Magistrate Judge Sean P. Flynn. At that point, Judge Jung had entered no substantive ruling and acquired no disputed history with either party. The random assignment placed the Second Action before a judicial officer who could consider its pleading, its EFAA election, and any later motion to compel on a record independent of the disputed August 5 Order.

## C.    The Sua Sponte Transfer

17.    On August 6, 2026, Judge Jung entered a one-page order sua sponte under Local Rule 1.07(a). Doc. 4. The Order states that, "[i]n view of the related and earlier-filed case" before Judge Barber, this action "is TRANSFERRED to Judge Barber, with his knowledge and consent, for all further proceedings." Id. The Order identifies no pending motion, no party request, no opportunity to be heard, and no case-management problem requiring immediate concentration of the cases.

18.    The docket then consisted of the Complaint, issued summonses, a notice concerning electronic service, and the transfer order. Docs. 1–4. No Defendant had appeared. No responsive pleading or motion was pending. No

discovery had begun. No scheduling order existed. No judicial investment would have been lost by leaving the original random assignment intact.

19.    The First Action, meanwhile, had been stayed and administratively closed by the order entered one day earlier. First Action, Doc. 54 at 8–9. It had no active federal discovery, merits schedule, trial date, or case-management track to coordinate with this action. The only immediate overlap was the disputed legal characterization and arbitration ruling that Plaintiff was preparing to challenge before Judge Barber.

### D.    The First-Action Motions Filed Contemporaneously

20.    Plaintiff is filing contemporaneously in the First Action four motions directed to the August 5 Order. One requests correction under Rule 60(a) of the incorrect reporter volume, typographical error, and misspelled party name. A second requests correction under Rule 60(a), or alternatively Rule 54(b), of the statement that Plaintiff received poor performance ratings. A third requests reconsideration under Rule 54(b) of the arbitration determination. A fourth requests amendment of the Order to certify the controlling EFAA gateway question under 28 U.S.C. § 1292(b).

21.    Those motions are not collateral to the appearance issue. They establish that Plaintiff must directly challenge the accuracy, completeness, and legal reasoning of the August 5 Order at the same time she must begin litigating a new employment action before its author. The transfer thereby converts an ordinary request for correction and appellate preservation in one case into the immediate institutional background of another.

## III.  GOVERNING LAW

### A.  The Court Has Plenary Authority to Revise the Transfer Order

22.  The transfer order is interlocutory. Under Federal Rule of Civil Procedure 54(b), an order adjudicating fewer than all claims or rights "may be revised at any time" before entry of final judgment. District courts hold plenary authority to reconsider, revise, alter, or amend non-final orders. *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1377–79 (11th Cir. 2024). The Court can vacate Doc. 4 and restore the original assignment before any substantive proceeding occurs.

23.  Local Rule 1.05(a) makes random assignment the District's starting rule. The Clerk must randomly assign each new action, cannot change an assignment without judicial order, and must report any apparent attempt to evade random assignment. M.D. Fla. L.R. 1.05(a). Local Rule 1.07(a)(2)(A) permits transfer when the receiving judge consents. That authority is discretionary. Its exercise remains subject to governing federal law, § 455(a), and the judiciary's interest in a neutral assignment process.

24.  The Eleventh Circuit treats interference with random assignment as an institutional concern. The assignment process protects the orderly administration of justice and public confidence in the courts. *In re BellSouth Corp.*, 334 F.3d 941, 956–59 (11th Cir. 2003). The inquiry reaches beyond subjective motive to timing, judicial investment, injury to the parties, delay, expense, and the potential for impropriety. Id. at 951–59. Restoration here preserves the random assignment. It does not manipulate it.

**B.    Section 455(a) Protects the Objective Appearance of Impartiality**

25.    Section 455(a) commands that a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The statute reaches appearance as well as actuality. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 858–60, 865 (1988). Its object is public confidence in the integrity of the judicial process. Actual bias is not an element. Id. at 859–60.

26.    The Eleventh Circuit asks whether "an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003); accord *United States v. Scrushy*, 721 F.3d 1288, 1303 (11th Cir. 2013); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988). Doubts are resolved in favor of recusal. *Patti*, 337 F.3d at 1321.

27.    The Code of Conduct for United States Judges states the same obligation. A judge should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary and should disqualify himself when his impartiality might reasonably be questioned. Code of Conduct for U.S. Judges, Canons 2A, 3C(1). These duties govern adjudicative and administrative acts alike. Id., Canon 3A Commentary.

28.    Plaintiff acknowledges the limiting principles. Judicial rulings alone almost never establish a valid basis for disqualification. *Liteky v. United States*, 510 U.S. 540, 555 (1994). Rulings in the same or a related case ordinarily do not suffice absent pervasive bias. *Bolin v. Story*, 225 F.3d 1234, 1239 (11th Cir. 2000). And a

judge must remain assigned when a recusal request rests on unsupported or highly tenuous speculation. *In re Moody*, 755 F.3d 891, 895 (11th Cir. 2014).

29. This motion does not rest on the August 5 ruling alone. A ruling, standing alone, is not a ground for disqualification. But a ruling is not all that happened here. One day after rejecting the legal character of the harassment dispute, the same judge agreed to take a new case built on that very dispute. No party asked him to. No pending proceeding required it. No prior work on the new case justified it. And at that same moment, Plaintiff was preparing to ask him to correct a public misstatement about her professional record—in an order she must now challenge before its author, in a case about whether anyone will hire her. Each fact, taken alone, might mean little. Taken together, they mean a great deal. The ground for this motion is all of it.

## C.   The Eleventh Circuit's Reassignment Factors Confirm the Appropriate Remedy

30. When reassignment is considered to preserve the appearance of justice, the Eleventh Circuit evaluates: "(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; [and] (3) whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." *United States v. Torkington*, 874 F.2d 1441, 1446–47 (11th Cir. 1989). The factors apply even when no finding of actual bias is made. Id.

31.     *Torkington* also explains why restoration is an institutional remedy rather than a personal accusation. Reassignment may be required to preserve public confidence without questioning the judge's actual ability, integrity, or impartiality. Id. at 1447. The focus is the appearance produced by the record and the comparative cost of the remedy.

## IV.   THE TRANSFER SHOULD BE VACATED

### A.    The Transfer Made a Disputed Ruling the Starting Point of a New Case

32.     Before Doc. 4, the August 5 Order was an adverse interlocutory ruling in another case. Plaintiff could seek correction, reconsideration, certification, and eventual appellate review on that docket while litigating this later retaliation action before the judge randomly assigned to it. After Doc. 4, the Order became the starting point of this one.

33.     The Second Action's EFAA election alleges that the new claims relate to the sexual-harassment dispute asserted in the First Action. Doc. 1 ¶ 5. The August 5 Order had just concluded that the First Action did not plausibly state a qualifying sexual-harassment claim and would fail even under the alternative nonfrivolousness approach. First Action, Doc. 54 at 5–7 & n.3. Any motion to compel arbitration in this case will place that relationship before the Court. An objective observer could reasonably doubt whether the new election begins from this Complaint or from the conclusion announced one day earlier.

34.     The manner of the transfer sharpens the doubt. The concern is not that the original assignment lacked randomness; it did not. The Clerk randomly

assigned this action to Judge Jung. The concern is that the random assignment was affirmatively displaced one day later, with Judge Barber's knowledge and consent, immediately after Judge Barber decided the predicate EFAA dispute, before any Defendant appeared, before any party requested transfer, and before briefing began in this action. The objective observer therefore must account not merely for related-case administration, but for the affirmative judicial displacement of the random assignment at the precise moment Plaintiff stood ready to challenge the prior ruling.

35. The concentration that results is circular. Judge Barber will decide whether his August 5 description of Plaintiff's professional record was accurate. He will decide whether his ruling should be revised or certified for appeal. And he will decide whether the reasoning of that ruling removes this action from federal court as well. A fully informed observer could reasonably perceive institutional defense of the first decision in tension with independent consideration of the second case.

**B. The Performance-Rating Error Intersects the Subject Matter of This Action**

36. The Order says Plaintiff's ratings were poor. The pleading says they were the second-highest Defendants give. First Action, Doc. 54 at 2; First Action, Doc. 22 ¶¶ 26–27. Both cannot be true, and only one is on file. The statement is not a disagreement about wording. It is a public judicial statement about Plaintiff's professional record, and it reports the opposite of the pleaded facts.

37. That record is the subject of this case. Plaintiff alleges that Defendants recruited her without solicitation, interviewed her, selected a male candidate, declined to interview or select her for eleven additional positions, and failed to respond to a certified request concerning those applications. Doc. 1 ¶¶ 26–47. She seeks back pay, instatement or front pay, compensatory damages for loss of professional standing, and injunctive relief concerning future applications. Id., Prayer for Relief.

38. The judge who wrote that sentence now holds the case about whether anyone will hire her. Plaintiff must ask him to correct the statement while asking him to decide whether her hiring and retaliation claims may proceed in court. A reasonable observer could view that alignment as compromising the appearance of an unburdened adjudication, however narrow the correction request may be.

39. Restoration cures the problem without disturbing the First Action. Judge Barber keeps the motions directed to his own Order. Judge Jung, or another randomly assigned judge, takes a new case concerning later conduct and decides it on its own record.

**C.    No Party Sought the Transfer, and No Efficiency Supports It**

40. The dates are the argument. The order compelling arbitration and this Complaint were both filed August 5. The transfer came August 6. Nothing intervened that could create a case-management need.

41. No Defendant requested the transfer. No party briefed efficiency or consistency. No party addressed the First Action's stay and administrative closure. No party addressed whether this action's later conduct, later

decisionmakers, later documents, and separate administrative predicates called for independent adjudication. The transfer order gives one reason: relatedness. Doc. 4. Relatedness explains why a court might consider transfer. It does not answer the appearance created by this transfer at this time.

42.    The ordinary reason to concentrate related cases is coordination—of discovery, of schedules, of overlapping motions, of trial. None exists. The First Action has been compelled to arbitration, stayed, and administratively closed. First Action, Doc. 54 at 8–9. It has no discovery to coordinate, no schedule to align, and no trial to consolidate. Its only federal activity is the set of motions directed to the August 5 Order itself.

43.    Restoration is the cleaner allocation. Judge Barber addresses the challenges to his Order in the First Action. Judge Jung addresses the action originally assigned to him. Neither duplicates the other's work.

### D.    Each Torkington Factor Favors Restoration

44.    The first factor asks whether the judge would have difficulty putting previous views and findings aside. *Torkington*, 874 F.2d at 1446. The August 5 Order selected the governing EFAA standard, characterized the allegations, and held them insufficient under two approaches. The Second Action's election requires examination of its relationship to the same dispute. A reasonable observer could expect the prior characterization to carry substantial force in the new case.

45.    The pending First-Action motions deepen the difficulty. Judge Barber is asked to defend, revise, correct, or certify the very Order whose reasoning may

decide a motion to compel here. The first factor favors a fresh adjudicator for this action and leaves Judge Barber fully empowered in the first.

46. The second factor asks whether reassignment is appropriate to preserve the appearance of justice. Id. at 1446–47. The one-day sequence, the affirmative consent, the absence of any request, the overlap with the disputed EFAA ruling, and the performance-rating error would lead a fully informed observer to question whether this case begins on a neutral record. Restoration answers that question directly.

47. The third factor asks whether reassignment creates waste or duplication disproportionate to the gain. Id. It creates virtually none: no Defendant has appeared, no substantive motion has been briefed, no discovery has occurred, and no scheduling order has entered. The institutional gain exceeds the cost many times over.

48. All three factors point the same way. Restoration is early, clean, and inexpensive, and it removes the appearance problem before any merits or arbitration ruling can absorb it.

### E. The Liljeberg Considerations Favor Relief Now

49. *Liljeberg* identifies three considerations bearing on remedy: the risk of injustice to the parties in this case, the risk of injustice in other cases, and the risk of undermining public confidence in the judicial process. 486 U.S. at 864. Each favors relief now.

50. The risk to Plaintiff is immediate. She must brief a new action before the judge whose prior Order rejected the predicate statutory characterization,

misstated her professional record, and now faces four contemporaneous challenges. Any later order compelling arbitration would rest on a record in which the assignment objection was raised before substantive adjudication and left in place.

51. The institutional risk concerns what assignment practice signals. A self-represented litigant receives an adverse order, files a distinct action about later conduct, draws a different judge at random, and watches the new case move to the first judge the next day, with his consent. The process can appear outcome-linked rather than neutral.

52. The public-confidence risk is sharpest here. The receiving judge's public order misstates the plaintiff's professional performance, and the new case concerns her professional future. Prompt restoration keeps that statement, and the disputed EFAA analysis, from appearing to follow Plaintiff into every later action against these Defendants.

**F.     Plaintiff's Request Preserves Random Assignment and Is the Opposite of Judge-Shopping**

53. Plaintiff did not choose Judge Jung. The Clerk did. Plaintiff did not wait to test the judicial waters or to seek reassignment after an unfavorable ruling in this case. She raises the question at the first available moment—before any appearance, before any substantive order, and before any ruling could color the request.

54. That posture is the opposite of the manipulation addressed in *In re BellSouth* and *Bivens Gardens Office Building, Inc. v. Barnett Banks of Florida, Inc.*, 140

F.3d 898, 912–13 (11th Cir. 1998). Those authorities condemn efforts to maneuver around an assignment after learning a judge's disposition or receiving an unfavorable result. Plaintiff asks the Court to restore the assignment its own neutral process produced, before the receiving judge acts.

55.     Nor does Plaintiff claim any entitlement to Judge Jung personally. The primary relief is restoration because he was the original random assignee. If he does not consent to receive the action, Plaintiff requests random reassignment through the Clerk. The object is a neutral assignment, not a preferred decisionmaker.

## V.     CONCLUSION

56.     On August 5, Judge Barber compelled the First Action to arbitration, adopted a contested EFAA gateway standard, rejected the legal character of the predicate dispute, and misstated Plaintiff's professional performance on the public docket. The same day, Plaintiff filed this action, and the Clerk randomly assigned it to Judge Jung. On August 6, before any party appeared or asked, Judge Barber consented to receive it. Plaintiff must now challenge the accuracy and legal sufficiency of the August 5 Order before its author while its author decides whether the Order's reasoning removes this case from court. The assignment question comes before every substantive one, and it should be resolved first, by reasoned order, while the remedy remains costless.

57.     Restoring the original assignment imposes effectively no cost. It duplicates no work, disturbs no schedule, prejudices no Defendant, and leaves Judge Barber in full control of the First Action. It gives this action an independent

beginning and preserves the assurance that any motion to compel will be decided on this Complaint and this record.

58.   Plaintiff requests that the Court: (1) vacate the August 6, 2026 transfer order (Doc. 4); (2) withdraw the consent identified in that Order; (3) transfer this action to Judge Jung, subject to his consent; (4) if Judge Jung does not consent, return the action to the Clerk for random reassignment; (5) alternatively, disqualify under 28 U.S.C. § 455(a) and direct reassignment through the Clerk; (6) resolve this motion before considering any motion to compel arbitration, motion to dismiss, or other substantive request; and (7) enter a reasoned order addressing the grounds presented.

## LOCAL RULE 3.01(g) CERTIFICATION

Local Rule 3.01(g) requires the movant to confer with the opposing party before filing a motion. No Defendant has appeared in this action, and no counsel has appeared on any Defendant's behalf. There is accordingly no opposing party with whom to confer. Should a Defendant appear or counsel enter an appearance, Plaintiff will confer promptly and supplement this certification in accordance with Local Rule 3.01(g)(3).

Dated: August 7, 2026.                                Yuliya Glazman

                                         *Plaintiff, pro se*
                                       2110 Thousand Trails Road
                                         Clermont, Florida 34714
                                       Telephone: (407) 794-6503
                                       yglazman@protonmail.com

## CERTIFICATE OF SERVICE

I certify that on August 7, 2026, I served a true and correct copy of the foregoing on Defendants Citigroup, Inc. and Citibank, N.A. by United States mail, addressed to their registered agent:

The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

Yuliya Glazman